YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
500 Rose Street
Las Vegas, NV 89102
Phone (702) 385-7170
Email: vegasgoldenlaw@gmail.com
Attorney for Defendant
Tori Mangum

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATE OF AMERICA,

Plaintiff,

v.

TORI MANGUM,

Defendant.

Case No. 22-cr-50-APG-MDC

**SENTENCING MEMORANDUM (INEFFECTIVE ASSISTANCE OF COUNSEL AND 18 U.S.C. § 3553(a) FACTORS)**

Ms. Mangum pleaded guilty to the one count alleged against her in the indictment. Her first court-appointed attorney advised her to reject a binding plea agreement, that included a 94-month downward variance, then withdrew once the PSR applied "pseudo-count" grouping, which exponentially increased her guideline sentence to a potential life sentence.

Now, undersigned counsel respectfully requests that this Court sentence Ms. Mangum to a sentence between 144 months but no more than 168 months of imprisonment. This sentence would return Ms. Mangum back in the position she would have been in had she not received constitutionally deficient representation from prior counsel. It also takes into accounts all factors this Court must consider under 18 U.S.C. § 3553(a).

## I. MS. MANGUM'S PRIOR COUNSEL PROVIDED CONSTITUTIONALLY DEFICIENT ADVICE AND REPRESENTATION.

While Ms. Mangum was represented by prior counsel, a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(c) was extended. *Exhibit A*. Under the plea agreement, Ms. Mangum would have pled guilty to one count of sex trafficking of a minor, which carries a statutory 10-year mandatory minimum and a maximum sentence of lifetime imprisonment.

The plea agreement used USSG § 2G1.3 and contemplated an adjusted offense level of 41. With a three-level reduction for acceptance of responsibility and a criminal history category of II, this would have yielded an advisory guideline range of 262-327.

The parties would have jointly recommended a sentence of 168 months or 14 years. The joint recommendation would have been a 94-month, or nearly 8-year, downward variance. Prior counsel advised Ms. Mangum that she "could do better" and in order to do this she needed to reject this binding plea agreement. She was advised to instead plead guilty to one count of sex trafficking of a minor without a plea agreement. ECF 43. This advice resulted in a presentence investigation report which included "pseudo-count" grouping, produced a 360 month to life advisory guideline range, and recommended a 240-month term of imprisonment. ECF 58. Thereafter prior counsel withdrew. ECF 64.

### A. The Binding Plea Agreement Was Extremely Favorable to Ms. Mangum.

Undersigned counsel and her former associate, Andrew Wong, have a combined 30 years of federal criminal defense experience. We both know how rarely the government offers binding plea agreements under 11(c)(1)(c) in this district. To the best of our recollection, we have been offered less than a dozen binding plea agreements during our combined three decades of practice. We have had countless clients request binding plea agreements, only for the

government to decline the requests. In short, binding plea agreements are rare and are to be taken seriously and not to be rejected without lengthy and careful consideration.[1]

That principle is especially true in Ms. Mangum's case. Neither undersigned counsel nor Mr. Wong has ever been offered a binding plea agreement in a sex trafficking case. Neither of us can recall being offered anything close to a 94-month downward variance in similar cases. Had we been representing Ms. Mangum at the time, we would have emphatically advised her to accept the binding plea agreement. As it turns out, when present counsel questioned Ms. Mangum regarding what she understood about the prior plea agreement and why she rejected it, she was only able to vocalize that the deal was for 14 years. She did not understand that the offer was binding or what that meant. Ms. Mangum represented that she had never seen a written copy of the rejected plea agreement. The only possible explanation for prior counsel's advice would have been her belief or hope that she could get the statutory mandatory-minimum sentence of 120 months after a straight plea. Put another way, prior counsel hoped she could obtain a 142-month downward variance from the low-end of the advisory guidelines even though the government agreed to be bound by a 94-month downward variance.

### B. A Reasonably Competent Attorney Would Have Advised Ms. Mangum to Accept the Binding Plea Agreement.

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). "During plea negotiations defendants are entitled to the effective assistance of competent counsel" and the *Strickland v. Washington* test applies to "challenges to guilty pleas based on ineffective assistance of counsel."

[1] Neither undersigned counsel nor Mr. Wong recall having had a client reject a binding plea agreement when one was presented. In the event, a client wanted to reject a favorable plea agreement, let alone a favorable binding plea agreement, we would have required the client articulate, in their own words, why they preferred the alternatives to the binding plea agreement.

*Id.* at 162-63. "The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness." *Id.*

"To establish *Strickland* prejudice a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different." *Lafler*, 566 U.S. at 163. "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id.* Generally, "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 164.

In the context of the federal plea-bargaining process, a defendant must be properly advised in her "decision whether and when to plead guilty." *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003). "If it is ineffective assistance to fail to inform a client of a plea bargain, it is equally ineffective to fail to advise a client to enter a plea bargain when it is clearly in the client's best interest." *Id.*

Defense counsel also "has a duty to supply criminal defendants with necessary and accurate information." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986). "Failure to investigate or prepare adequately for sentencing may render counsel ineffective." *United States v. Boothroyd*, 403 F.Supp .2d 1011, 1016 (D. Or. 2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003)).

"Though a mere inaccurate prediction, standing alone, would not constitute ineffective assistance the gross mischaracterization of the likely outcome presented in [a] case, combined with the erroneous advice on the possible effects of going to trial, falls below the level of competence required of defense attorneys." *Iaea*, 800 F.2d at 865. "Counsel's failure to anticipate the applicability of the grouping provision to [the defendant's] sentencing and failure then to advise [him] to move to withdraw from the plea agreement was constitutionally deficient." *United States v. Manzo*, 675 F.3d 1204, 1210 (9th Cir. 2012).

In *Manzo*, defense counsel failed to anticipate and advise his client that his offenses of conviction would group. 675 F.3d at 1209. Defense counsel and his client anticipated an advisory guideline range of 135-168 months. *Id.* at 1208. The PSR grouped the offenses of conviction and yielded an advisory guideline range of 292-365 months. *Id.* While defense counsel objected to the grouping at sentencing, he did not advise his client to attempt to withdraw his plea. *Id.* The court sentenced the defendant to 292 months imprisonment. *Id.*

On collateral review, the Ninth Circuit held defense counsel's performance to be constitutionally deficient based on the failure to anticipate the grouping and the failure to advise the defendant to withdraw his plea. *Manzo*, 675 F.3d at 1209. The Ninth Circuit observed "[t]his was not a minor technical error, but rather it had major impact on the calculation of the discretionary Sentencing Guidelines." *Id.* The appellate court also noted the substantial increase in the guideline range was a major factor in counsel's constitutionally deficient performance. *Id.* ("It is hard to avoid the conclusion that because of the grouping of offenses for sentencing purposes, Mazo did not get the benefit of the bargain that led him to plead guilty in the distribution case and forgo appeal rights in the manufacturing case."). The Ninth Circuit

remanded the case for the district court to determine if the defendant had suffered prejudice due to counsel's constitutionally deficient performance." *Id.* at 1210.

Here, prior counsel's constitutionally deficient performance was two-fold. First, prior counsel failed to investigate and advise Ms. Mangum about the "pseudo-count" grouping which significantly increased Ms. Mangum's advisory guideline range. Without this information, Ms. Mangum was unable to properly weigh whether accepting or rejecting the binding plea agreement was in her best interest. Second, prior counsel's advice to Ms. Mangum to reject a 94-month downward variance in a binding plea agreement clearly fell below the objective standard for reasonableness.

### C. Prior Counsel's Failure to Investigate and Advise Ms. Mangum About the Potential for "Pseudo-Count" Grouping or the Cross-Reference Deprived Ms. Mangum of a Meaningful Opportunity to Consider the Binding Plea Agreement.

Courts have held counsel's performance is constitutionally deficient when: 1) counsel failed to anticipate grouping under the federal sentencing guidelines, *Manzo*, 675 F.3d at 1209; 2) counsel failed to investigate his client's statutory safety-valve eligibility, *Boothroyd*, 403 F.Supp.2d at 1016; 3) counsel failed to assist his willing client to provide cooperation and obtain a government substantial assistance motion at sentencing, *Leonti*, 326 F.3d at 1116; and 4) counsel advised his client to reject a "fast-track" plea agreement with an expectation that counsel could obtain an even lower offer. *United States v. Soto-Lopez*, 475 Fed. Appx. 144, 146 (9th Cir. 2012).

In *Soto-Lopez*, the Ninth Circuit held defense counsel's performance to be constitutionally deficient when he advised his client to reject a "fast-track" plea offer, which included a joint recommendation for 48 months, and assured the client he could obtain an offer for 24-30 months. 475 Fed. Appx. at 146. In finding counsel performance constitutionally

deficient, the Ninth Circuit pointed to: 1) defense counsel's strategy of pleading without a plea agreement increased client's sentencing exposure from 54 months to 240 months; 2) that there was "no evidence–at the time he advised Soto-Lopez to reject the plea offer–[defense counsel] knew of any reason Soto-Lopez could reasonably expect the government to offer him a 24- or 30-month plea deal when he faced a minimum 77-month sentence under the Guidelines"; and 3) defense counsel had "very little experience" in the charging district and filed no dispositive motions after he advised the client to reject the plea deal. *Id.*

Here, prior counsel's failure to investigate, research, and advise Ms. Mangum of the "pseudo-count" grouping and applicable cross reference was constitutionally deficient. Based on the broad, plain language of USSG 2G1.3(d)(1), Application Note 6, and its commentary, there was a high likelihood that "pseudo-count" grouping could be applied to Ms. Mangum's case due to multiple uncharged victims potentially being involved in the conduct to which Ms. Mangum pleaded guilty.[2] The same is true for the child pornography production cross-reference that is included in the operative PSR. Either calculation dramatically increased Ms. Mangum's sentencing exposure under the Guidelines from a low-end of 262 months to a range of 360 months to life.

The fact that the government was willing to bind itself, and potentially this Court, to a Guidelines calculation that excluded the "pseudo-count" grouping from the agreed upon Guidelines calculations represented a sizable benefit for Ms. Mangum. Prior counsel compounded this investigatory error by failing to advise Ms. Mangum to accept a very favorable

[2] Undersigned counsel has no indication that prior counsel was prepared to mount the systemic, constitutional challenge to "pseudo-count" grouping that is made in the companion sentencing memorandum. Prior counsel's inaction was thus an egregious oversight, not grand strategy.

binding plea agreement. *Leonti*, 326 F.3d at 1117. That plea agreement included a 94-month downward variance on top of more favorable Guideline calculations.

The only reason to advise Ms. Mangum to reject the binding plea agreement is that prior counsel believed she could obtain the mandatory minimum 120-month sentence. Nothing in undersigned counsel's experience would lead her to believe that such a sentence would be a realistic outcome in light of the facts and circumstances of this case as set forth in the PSR.

### D. This Court is Still Able to Address Any Prejudice Stemming From Prior Counsel's Constitutionally Deficient Performance.

At this juncture, this Court can inoculate this case from years-long appeals and habeas petitions. Remedies for ineffective assistance of counsel "must neutralize the taint of a constitutional violation" and should be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Lafler*, 566 U.S. at 170. By sentencing Ms. Mangum to any term of months between 144 and 168-months imprisonment, this Court will put her back in the place she would have been had she received constitutionally effective counsel during the plea-bargaining stage. By sentencing Ms. Mangum to what she would have bargained for, this Court would directly address any prejudice Ms. Mangum may have suffered due to prior counsel's representation and these admittedly convoluted proceedings.

## II. MS. MANGUM'S CHILDHOOD TAUGHT HER TO INTERNALIZE SEX AS LEVERAGE FOR SURVIVAL.

In Ms. Mangum's short 26 years, she has experienced a lifetime of trauma and abuse. Ms. Mangum never had a stable home. Ms. Mangum is the youngest of her mother's seven children. From birth until the age of eight, she lived in four different states and countless "homes." The family moved often to avoid CPS involvement. The family was often homeless. As a child, Ms. Mangum lived in tents, out of cars, and in weekly rentals. When the money ran out, the family would be on the streets again.

At age eight, Ms. Mangum's mother moved the family out west and eventually settled in Loveland, Colorado. Her mother worked temporary jobs through a placement agency. In addition, her mother also tried to supplement their income by being a stripper, a prostitute, and selling drugs. Ms. Mangum and her siblings were often left to fend for themselves.

Despite the challenges of constantly moving to a new town, Ms. Mangum excelled in school. She developed an interest in reading and writing. She tried playing sports but ended up quitting because of the lack of support. Just when Ms. Mangum's life looked to be turning around, her mother pulled Ms. Mangum out of school to care for the family after her older sister's arrest and incarceration.

At the age of 13, Ms. Mangum's mother pulled out of school to care for her sister's young children full-time. At this point, the family was homeless again. Three generations were living in an old Ford Taurus. Ms. Mangum recalls being crammed into the car and moving from parking lot to parking lot each night. At the age of 15, Ms. Mangum lost this meagre semblance of stability when her mother abandoned her along with her niece and nephew on the streets in Colorado. Ms. Mangum relocated to Las Vegas. Her sister tried to assist Ms. Mangum as much as she could but from age 15 on, Ms. Mangum has basically been on her own going back and forth between Nevada, California, and Colorado.

Had Ms. Mangum just experienced the tumult and instability of growing up homeless, the impact on her life would have been profound. But against the backdrop of chronic homelessness, Ms. Mangum was exposed to sex work from an early age. Her mother and sister worked as a stripper and prostitute to support themselves and their family. Her mother's mantra, which she taught to Ms. Mangum, was "if you ain't got no money, you can't get no honey." Between the ages of 8 and 15, she was sexually abused by an older boy. It progressed from

playing house and being touched in her privates to being sodomized. At the age of 10, Ms. Mangum began giving oral sex to boys in the neighborhood in exchange for food, trinkets, necessities. She lost her virginity through being drugged and raped. The distinction of sex as abuse and sex as a commodity is completely blurred for Ms. Mangum. She had internalized sex as leverage for survival.

By age 13, Ms. Mangum had begun selling herself. By age 16, she had developed a circle of "friends," who were other female prostitutes. The group would work collectively to keep each other safe. They would use tracking apps to keep tabs on everyone's location when they were out on "dates." They would share resources. They would pool their earnings to cover expenses. They developed a prostitution system with no hierarchy and that did not rely on a male pimp. It is not hard to imagine how Ms. Mangum's young, traumatized mind would see this group as a collective, as family, and as her community. It is also not hard to see how Ms. Mangum would replicate this fundamentally flawed "collective/family" when she committed the present offense. Ms. Mangum's traumatic upbringing, which normalized this lifestyle, does not excuse her actions but it does give her conduct context. Ms. Mangum states candidly in her defense submission video, "I don't put the blame on anybody, I put the blame on myself, because I should have knew better, and if I would've knew better, I would've probably did better, but I didn't, I just did what I knew how to do." *Exhibit B (manually filed)*.

## III. THE SENTENCE IN THIS CASE WILL BE THE LONGEST PERIOD OF STABILITY MS. MANGUM WILL HAVE HAD IN HER YOUNG LIFE, MS. MANGUM WILL USE THIS TIME TO IMPROVE HER PROSPECTS.

Ms. Mangum was arrested January 2022, she has been in continuous state and/or federal custody since. She still has a lengthy sentence ahead of her. Sadly, for Ms. Mangum, this time in custody and ultimately the sentence she receives will be the longest period of stability she has ever had in life. This is the longest period of time she has had a roof over her head. This is the

first time in her life that she's been able to put on enough weight to weigh over 100 lbs. This is the only time she has had enough stability to learn to self-regulate, to take care of herself, for self-reflection, to truly apply herself to learning and improving.

Ms. Mangum's growth since her arrest has been remarkable. As noted in the PSR, early on while in custody at Nevada Southern Detention Center, she received several disciplinaries. Ms. Mangum has since become a model detainee. Assistant Warden R. Melendrez of the facility, states:

> Detainee Mangum has been assigned duties as a pod porter, where she has performed her responsibilities in a consistent and reliable manner. In addition, she has successfully completed multiple detainee programs offered within the facility.
>
> Throughout her time at NSDC, Detainee Mangum has demonstrated exemplary conduct. She has shown a clear commitment to self-improvement, actively engaging in available programs and taking initiative in her personal development. Her positive attitude and work ethic reflect her dedication to making meaningful progress.
>
> *Exhibit C*.

To that end, Ms. Mangum has fully applied herself to programing. Ms. Mangum presented counsel with a stack of certificates of completion for more than 150+ courses. The courses cover a broad range of topics, from courses directly related to her crime, victim empathy, personal growth and development, anger management, emotional and thought regulation, sobriety, to basic academic courses, career exploration and development. Ms. Mangun has acknowledged that even though she is ineligible to earn any time off her sentence because of the classification of her offense, her first priority in BOP custody is programming. She has vowed to take advantage of every resource available to her that can help her reintegrate and build a life and career when she is released. With housing stability while serving her sentence, Ms. Mangum is hoping to finally have the opportunity to pursue an education. Despite her chaotic upbring,

homelessness, and prostituting herself, she always saw education as a way out of that cycle and lifestyle. Off and on, when she had a chance, she would enroll herself in school and at the age of 20, she earned her High School Diploma from the Milan Institute/Victory Learning, graduating with a 3.6 GPA. Her plan is to earn a degree – associates, college, or trade – in a profession, so that when she is released, she can support herself, never have to go back to prostituting herself, and become an upstanding and contributing member of society.

Ms. Mangum is deserving of every consideration available for a shorter sentence. Even with the recommended variance to 240 months, after the application of the cross reference and sex offense career offender, the recommendation is unduly harsh. That sentence equates to Ms. Mangum spending approximately as many years in prison as she was alive at the time of her arrest; a 20-year sentence for someone who was 21 years old at the time of her arrest; essentially a punishment of her entire life time. There is no argument that the offense she engaged in is an illegality that deserves punishment. The base offense alone carries a mandatory minimum sentence of 120 month. But to say that her guidelines calculation should be enhanced to be off the sentencing table, resulting in a life sentence, is incongruous to the actual offense conduct. That punishment should be reserved for the worse case scenarios of the pimps that exercise brutal coercion, overt violence, intimidation and fear, along with isolation, psychological and emotional manipulation. Even the recommended variance to a 20-year sentence, does not fully take into account how atypical the pimping culture this case presents. It is atypical for sex traffickers to be female and to be this young. Here, Ms. Mangum is also be prostituting herself along with other females who were already in the "game." She did not take all of their earnings. They shared resources such as cell phones, account user names and passwords. They pooled their earnings to cover expenses such as drugs, rides, hotel rooms. They shared their locations

with each other, to keep an eye on each other's safety. They wanted not to have to "choose up" on a male pimp. For lack of a better term, these girls were working and living in a prostitutes' collective/commune. In facilitating this activity, Ms. Mangum broke the law, especially because the victim was a minor. But for the difference in age, Ms. Mangum is as much a victim. Those two things are not mutually exclusive, Ms. Mangum can be a trafficker and a victim at the same time.

Because Ms. Mangum was so young at the time of her arrest, and despite what will be a very lengthy sentence, there will be so much life left for her to live following her incarceration. The duration of her sentence will have a direct impact on her future ability to reintegrate into society. A 20-year sentence will mean that she will not be released or able to enter the workforce until she is in her 40's. However, a sentence between 144 months (12 years) and 168 months (14 years) would allow Ms. Mangum to enter the workforce in her 30's. The difference of those years can greatly affect her future viability in getting hired and in her earning potential. Ms. Mangum should not be viewed as a dangerous recidivist. Her lifestyle and duality as prostitute and trafficker, stems from her resource scarcity, housing instability, and internalized belief that sex and her body were a commodity to be used for survival. When Ms. Mangum is released, she will have learned a profession by which she can support herself with. As established by the letters that follow, she will have family support to help her. Many of her family members have grown, along with Ms. Mangum, and have achieved stability that allows them to help her when she is released.

## IV. EXHIBITS IN AID OF SENTENCING

**A.** Prior binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(c)

**B.** Tori Mangum's Video Submission – *Manually Filed*

**C.** Letter from Assistant Warden R. Melendrez, of Nevada Southern Detention Center, praising Ms. Mangum

**D.** Certificates of Completion – *Manually Filed due to volume*

- Human Trafficking in the United State: The Truth and What You Can Do About It
- Victim Impact
- PREP Domestic Violence
- Building Resilience
- Motivation and Inspiration for Incarceration to Recovery
- Motivation and Inspiration for incarceration to Recovery with Jesse Trav and Walter
- 5 Steps to Change Your Life – Victorious Living
- How Can I Heal form Child Sexual Abuse
- LGBTQ+ Safe Zone Training
- Introduction to Changin' Your Game Plan: The Blueprint to Success
- Reclaiming our Humanity: A Journey of Transformation and Liberation
- Conflict Resolution: Bring Order to Disorder
- Anger Management
- Business Ethics: Whistle-Blowing
- Business Ethics: Unethical Behavior
- Business Communication
- Business Accounting: Accounting for Inventory
- Budgeting: Manufacturing Budgets
- Budgeting: Budgeting Fundamentals
- Advanced Interpersonal Communication: Colleagues and Subordinates
- On Ramp
- Destination
- Highway
- Off Ramp
- Go Further
- The ABS's of Cleaning Chemistry
- Becoming Tech Savy
- Business Problem Solving: Problem Solving in the Corporate World
- CERT Unit 2: Organization
- Career Planning and Salary
- Coaching: Fundamentals of Coaching
- Be the First to Respond
- Choosing the Best Solution
- Computer Science
- Creating a Safety Program
- Cover Letters
- Valor Life 96
- Valor Life 97
- Valor Life 98
- Valor Life 99
- Valor Life 89
- Valor Life 90
- Valor Life 92
- Valor Life 93
- Valor Life 94
- Valor Life 88
- Valor Life 95
- Managerial Leadership: Making Vision a Reality
- Manual Materials Handling
- Managerial Leadership: Coping Through a Change Process
- Managerial Leadership: Employing Motivational Strategies
- Get in the Heard with Marshall and Eli – Live from Henrico West Jail
- Get in the Heard with Jodale – Live from Henrico West Jail
- Get in the Heard with Moe and Mary Ellen – Live from Henrico West Jail
- Get in the Heard – Recovery Podcast – Tammie Hagen
- Get in the Heard – Recovery Podcast – Brandon Novak – Pro-Skateboarder and Jackass Co-star

- Get in the Heard – Recovery Podcast – Brandon Novak – Cricket Speaks form Henrico East Jail
- Forklift Safety
- Get in the Heard – Recovery Podcast – Moses Wright
- Get in the Heard – Recovery Podcast – Mandie Brando
- ECS34_Facility Tour – Sirna and Sons Produce
- ECS35_Facility Tour – Blue Ribbon Meats
- ECS36_Facility Tour – Top Shelf Coffee and Tea
- ECSFIN_Next Steps
- ECS33_Steps of Service
- ECS35_Facility Tour – Mitchell's Home Made Ice Cream
- Welcome to the CypherWorx LCMS – ViaPath
- PowHER Pathways Exploring Careers in the Energy Trades
- Beginning a New Career
- Career Exploration
- Bloodborne Pathogens and HIV
- Canva
- Beginning Graphic Design
- Combating Sexual Harassment in the Workplace
- Conflicts of Interest
- Electrical Safety
- Effective Health and Safety Committees
- Digital Photography
- Freelancing 101
- Equal Opportunity 101
- Employment
- Hazard Communication Basic
- Introduction to Warehouse Operations
- Introduction to Construction Trades
- Implicit Bias
- Iceberg Thinking
- Honest Jobs
- Job Success
- New Tech
- Mold Safety Awareness
- Motivation: Identifying, Planning, and Implementing: Using What You've Learned
- Mobile Equipment
- Seven Secrets to Public Speaking
- Volunteer Recognition on a Next-to-Nothing Budget
- Use Information Correctly
- The NoFEAR Act
- The Globally Harmonized System (GHS) for Hazard Classification and Labeling
- Team Participation: Consensus
- Substance Abuse
- World Class Innovations in Human Resources
- The Roadtrip Nation Experience
- Good News for All
- Lessons for Christian Living
- Learn Your Strengths form Shining Light
- Grow with Google: Track Graduation Requirements
- The GOGI Life Tools – Boss of my Brain
- Career Exploration: The Transportation Industry
- Embracing Unexpected Change
- Banish Your Inner Critic to Unleash Creativity
- Why Trust Matters with Rachel Botsman
- Communication Foundations
- Empathy for Customer Service Professionals
- Course 1: Introduction to Entrepreneurship
- #1 – Jesus the Christ – WELS – Prison Ministry
- One God, One Way
- #18 – God Helps Me Manage My Anger – WELS – Prison Ministry

- The GOGI Life Tools – Belly Breathing
- Construction Management Foundations
- Introduction to the 2nd Opportunity Programs
- Basic Spanish Skills
- Sales Skills: Basic: The Sales Presentation
- Partners in Parenting
- Opioid Overdose Information
- Seeking Substance Abuse Treatment
- Math – Addition, Subtraction, Multiplication, and Division
- Managing Stress
- ART – Aggression Replacement Therapy
- Reflections and Recovery
- Career Exploration: Marketing, Sales, and Service
- Criminal Process: The Basics
- Rewired Program
- How Can I STOP My Anger
- Career Exploration: Information Technology
- Introduction to Carpentry
- Career Exploration: Construction Industry
- Houses of Healing – A Prisoner's Guide to Inner Power and Freedom
- A Guide through the 12 Steps of Recovery
- Stressful Life Events
- Women's Health
- Social Studies – Geography
- Cultural Competence
- Learning Tips: How to Enjoy Learning
- Offender Responsibility
- Entrepreneurship
- Basic Education
- Behavior Change
- Career Resources
- Conflict Resolution
- Cognitive Awareness
- Basic First Aid
- Beyond Email
- Critical Thinking and Decision Making
- Adapting to Change
- Careers Without College
- Contentious Relationships

**E.** Letter from Alvin Walker, Ms. Mangum's longtime friend from childhood, dated December 14, 2024

**F.** Letter from Spencer Mangum, Ms. Mangum's biological father, who she recently re-connected with, dated August 7, 2024

**G.** Letter from Frances E. Frye, Ms. Mangum's grandmother, dated May 4, 2026

## V. CONCLUSION

Ms. Mangum's traumatic upbringing does not excuse her actions. It gives her conduct context and makes her part of the least culpable cohort of defendants convicted of the instant offense. The government presented Ms. Mangum with a fair resolution to her case, which she should have accepted. Due to prior counsel's constitutionally deficient advice, however, Ms.

Mangum without being fully informed rejected a binding plea agreement that included a 94-month downward variance and without either of the harsh enhancements that are the subject of the companion sentencing memorandum [Cross-Reference and Sex Crime Career Offender]. This Court should give Ms. Mangum the benefit of the bargain she should have been emphatically advised to accept and sentence her to a term between 144 and 168 months imprisonment.

DATED: October 6, 2026.

Respectfully submitted,

*/s/ Yi Lin Zheng*
Yi Lin Zheng
Vegas Golden Law
Attorney for Tori Mangum

**CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers. That on, October 7, 2026, she served an electronic copy of this **SENTENCING MEMORANDUM (INEFFECTIVE ASSISTANCE OF COUNSEL AND 18 U.S.C. § 3553(a) FACTORS)** by electronic service (ECF) to the persons named below:

United States Attorney's Office
AFROZA YEASMIN
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

*/s/ Yi Lin Zheng*
Employee of Vegas Golden Law